**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| GERALD KETTLER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:22-CV-500 SRW |
| | ) | |
| METROPOLITAN ST. LOUIS | ) | |
| SEWER DISTRICT, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM AND ORDER</u>**

This matter comes before the Court on Defendant's Motion for Summary Judgment Directed to Catherine Politte (ECF No. 81), Motion for Summary Judgment Directed to Plaintiffs Gerald Kettler and Dennis Boatwright (ECF No. 83), and Motion to Strike Portions of the Declaration of Catherine Politte in Opposition to Defendant's Motion for Summary Judgment (ECF Nos. 118, 120). The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c). For the following reasons, the Court will grant these motions.

**I.      BACKGROUND**

Plaintiffs Gerald Kettler, Dennis Boatwright, and Catherine Politte filed this action alleging Defendant Metropolitan St. Louis Sewer District ("MSD") discriminated against them in violation of 42 U.S.C. § 1981, 42 U.S.C. § 2000e-5, and Missouri Revised Statute § 213.055. Kettler and Boatwright assert MSD discriminated against them based on their race because MSD terminated them for violations of MSD's policies when African Americans who had committed similar violations were not terminated. Similarly, Politte alleges MSD discriminated against her based on her race and gender because MSD terminated her for violations of MSD's policies

1

when African Americans and males who had committed similar violations were not terminated. MSD filed a motion to dismiss, which the Court denied. MSD also filed a motion to sever Kettler and Boatwright's claims from Politte's. The Court denied that motion, without prejudice, allowing MSD to raise the issue again before trial. Plaintiffs filed an amended complaint adding claims that had become fully exhausted. After completing discovery, MSD now seeks summary judgment on all of Plaintiffs' claims.

Before addressing MSD's motions for summary judgment, the Court will first decide the motion to strike which concerns Politte's declaration submitted by Kettler and Boatwright in support of their response to MSD's motion for summary judgment against their claims.

## II.    MOTION TO STRIKE

MSD seeks to strike Politte's declaration filed in support of Kettler and Boatwright's response in opposition to MSD's motion for summary judgment. MSD asserts Politte's declaration contains statements on which she has no personal knowledge, statements with legal conclusions, and inadmissible hearsay. MSD asks the Court to strike paragraphs 6, 8, 10-12, and 14-15. In response, Politte asserts MSD's arguments are appropriate for cross-examination at trial, not a basis for striking the statements. She also argues the statements are facts well-known or widely known within MSD and her statements do not contain legal conclusions but instead discuss MSD's standard operating procedures about which witnesses are allowed to testify.

Federal Rule of Civil Procedure 56(c)(4) requires an affidavit used to support or oppose a motion for summary judgment to "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." "When an affidavit does not meet this standard, it is subject to a motion to strike." *McSpadden v. Mullins*, 456 F.2d 428, 430 (8th Cir. 1972). The Court "consider[s] only

admissible evidence and disregard[s] portions of various affidavits and depositions that were made without personal knowledge, consist of hearsay, or purport to state legal conclusions as fact." *Howard v. Columbia Public Sch. Dist.*, 363 F.3d 797, 801 (8th Cir. 2004).

The Court will disregard some paragraphs in the declaration but not all of those requested by MSD. Paragraph six states:

> VJ worked under me when I was Division Manager of Grand Glaize. He was a Black man. He was a Customer Service Operator team lead. It was well-known by the Director of Operations and the Assistant Directors, as well as the Division Managers, that VJ regularly reported more time to MSD than he worked. For example, we all knew that VJ would leave a jobsite while his crew was working, then claim the hours they worked on his timecard. I would counsel him about this, but I was not allowed to issue any discipline to him about it, nor was it issued to VJ by the Director or an Assistant Director. We also knew that in one particular three-month period, VJ submitted time for working 5-6 Saturday standby shifts, but he did not work them. On this occasion, VJ was issued a written reprimand by Director Sprague.

The Court will disregard the statement, "It was well-known by the Director of Operations and the Assistant Directors, as well as the Division Managers, that VJ regularly reported more time to MSD than he worked." Politte does not establish any foundation for her personal knowledge of what the Director of Operations, the Assistant Directors, and the Division Managers knew about VJ's time violations. With respect to the remainder of the statement, Politte plausibly has personal knowledge of these matters because she was VJ's division manager.

The Court will disregard paragraph eight, which states:

> Shortly after I started with MSD, so while I was a Division Manager, CSO team lead BW threatened to kill Human Resources Director Vicki Taylor Edwards. This threat was widely known at MSD, as was the fact that an employee had audio-taped it. In my experience at MSD, threats of violence were not tolerated and an employee issuing a threat of that ilk would be fired. At the time I left MSD, approximately 10 years later, BW was still there. BW is Black.

This paragraph refers to rumors about another employee's discipline but provides no basis for Politte's personal knowledge about the employee. Unlike in paragraph six, where Politte

explained the employee at issue was her subordinate, there is no suggestion in paragraph eight that Politte had any personal knowledge of the employee beyond rumors and gossip. *Mahn v. Jefferson Cty.*, 2016 WL 827935 at *5, n.4 (E.D. Mo. Mar. 3, 2016) ("As rumors and gossip are not admissible evidence and not based on personal knowledge, those statements are not included.").

The Court will disregard paragraph ten. MSD challenges paragraph ten arguing it includes legal conclusions because who has policymaking authority is a matter of state law. MSD also asserts Politte lacks personal knowledge of the Board of Trustees' actions. Paragraph ten states:

> While I was an assistant Director of Operations, I was aware that MSD's Board of Trustees (BOT) had, officially or unofficially, delegated policy-making authority over discipline in Operations to the Director of Operations. Thus, both Directors I worked under independently created and/or maintained MSD policy about discipline without input by or direct oversight from the BOT. The Directors did not report their disciplinary policies or decisions to the BOT. The only check or balance on the Director's disciplinary policy-making was through review by the Civil Service Commission of disciplinary decisions.

Politte's statement is not a legal conclusion because she states what she was aware of as an employee, not who actually has policymaking authority under state law. However, she fails to provide a foundation for her knowledge of the Board of Trustees' actions. She does not state that as an Assistant Director of Operations, she witnessed interactions between the Board of Trustees and the Director of Operations or had seen communications between them. For example, she states, "The Directors did not report their disciplinary policies or decisions to the [Board of Trustees]," but she does not provide any basis for her knowledge of what the Directors did or did not report. Because Politte has failed to establish a foundation for her knowledge in this statement, the Court will disregard the statement.

4

The Court will disregard paragraph 11 because it includes statements in which Politte has not established she has personal knowledge. Paragraph 11 states:

> I was also aware of a long-standing, consistent work policy at MSD that a crew's time all had to agree, and that the Team Lead told the rest of the crew the amount of time to record. I understand that this was part of the formal training that maintenance employees received from MSD Training Coordinator Carol Alt.

In addition to failing to lay a foundation for her statement, Politte's deposition testimony conflicts with her affidavit. In her deposition, she stated she does not have an understanding of what is appropriate for a standby team to record as working time. Yet, her affidavit states she was aware of a long-standing policy that all members' time of a standby crew had to agree, and that this was part of the formal training employees received.

The Court will disregard paragraph 12, which states:

> At one point while I was an Assistant Director, KB was a supervisor over the Mintert yard. I learned that he had approved a paid day off for the entire yard, without seeking approval from upper management. I also believe he was intentionally permitting his employees to over-report overtime. I brought these matters to the attention of Director Sprague and Human Resources Director Tracey Coleman, but KB was not investigated or disciplined. KB is Black.

The paragraph includes a statement based on belief which is insufficient and does not establish the affiant had personal knowledge of the matter. *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1367 (8th Cir. 1983). Additionally, Politte fails to provide a foundation for her personal knowledge of the rest of the paragraph. As an Assistant Director, she may have knowledge of KB's actions, but she does not sufficiently establish that foundation.

The Court will not disregard paragraph 14. MSD asserts the paragraph contains statements based on information and belief, not Politte's personal knowledge. Paragraph 14 states:

> During this time period, Berthold was the Assistant Director of Operations over the collection systems where VJ worked. Based on Director Sprague's standard

5

operating procedure of discussing discipline with both his Assistant Directors,
especially with the assistant who had responsibility for the area, it is inconceivable
that Berthold would have been unaware of VJ's timekeeping violations and that VJ
was either not disciplined at all or was lightly disciplined for each violation. It is
similarly inconceivable that Berthold would have been unaware of BW threatening
to kill a director and that he was not terminated for doing so; of KB overpaying his
entire yard by giving them an unapproved paid day off and of KB allowing over-
reporting of overtime.

This statement is Politte's opinion based on her knowledge of Mr. Sprague's common practice of
discussing discipline with his Assistant Directors. The Court will consider the statement for
Politte's opinion but not for the fact that Berthold actually knew of the alleged disciplinary
violations by other employees. Because there is a foundation for Politte's opinion, the Court will
not disregard this paragraph.

Finally, the Court will disregard the statement in paragraph 15. MSD asserts paragraph
15 contains inadmissible hearsay, and Politte lacks personal knowledge of the information
contained in the statement. Paragraph 15 states:

No one expressly told me that MSD had a policy of not disciplining Black
employees or, if discipline was unavoidable, issuing less discipline to a Black
employee than to a non-Black employee, but I witnessed it occurring on an ongoing
and widespread basis over my 14 years at MSD. I saw it happen under two Directors
of Operations and two Human Resource Directors. Time after time, when a Black
employee engaged in behavior that would have resulted in discipline or discharge
for a non-Black employee, s/he was either not disciplined at all, or s/he was given
substantially lesser discipline than he would have received if s/he had been non-
Black. In addition to the examples discussed above and to the incidents being
litigated here:

a.      I saw a Black human resources employee who did not get disciplined for
sleeping on the job, and then received almost no discipline when she tried to hide
being tardy by stopping at a treatment plant on her way to work. She had multiple
violations, but was never fired, and she eventually retired with her pension and
medical benefits.

b.      I received calls from residents who observed 4-5 MSD trucks at a QT or at
a park with Black employees sleeping on the job. They did not get disciplined at
all.

Rule 56(c)(4) requires a declaration to set out facts that would be admissible in evidence and show that the declarant is competent to testify on the matters stated. Nothing in this statement establishes Politte is competent to testify on the black employees she asserts were treated differently. She does not state they were her subordinates, or she was in some way involved in disciplining the employees. Additionally, her statement that she received calls from residents who observed employees sleeping on the job is inadmissible hearsay when used to establish the truth of the matter asserted – that the employees were actually sleeping on the job and not disciplined for the violation of MSD policy.

For these reasons, the Court will grant, in part, and deny, in part MSD's motion to strike.

## III.    MOTIONS FOR SUMMARY JUDGMENT

MSD filed a motion for summary judgment against Kettler and Boatwright and a separate motion for summary judgment against Politte. In both motions, MSD asserts it is entitled to summary judgment on all of Plaintiffs' claims because MSD is not a covered employer under § 1981, there is no evidence of an unconstitutional policy or custom of MSD, Plaintiffs cannot establish prima facie cases of discrimination, there is no evidence of pretext, and any claims for punitive damages are barred as a matter of law.

### A.    Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine material fact is one such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The burden of demonstrating there are no genuine issues of material fact rests on the moving party, and the

7

Court considers the evidence and reasonable inferences in the light most favorable to the nonmoving party. *Allard v. Baldwin*, 779 F.3d 768, 771 (8th Cir. 2015). To avoid summary judgment, the non-movant must demonstrate the existence of specific facts supported by sufficient probative evidence that would permit a finding in his or her favor on more than speculation. *Donathan v. Oakley Grain, Inc.*, 861 F.3d 735, 739 (8th Cir. 2017). Where the record as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Combs v. Cordish Cos.*, 862 F.3d 671, 680 (8th Cir. 2017).

### B.     Undisputed Material Facts

MSD is a municipal corporation and political subdivision of the State of Missouri established under the provisions of Section 30 of Article VI of the Constitution of the State of Missouri. MSD is an equal opportunity employer that maintains and adheres to policies prohibiting discrimination and harassment based on race, gender, or any other protected characteristic. MSD prohibits any form of reprisal, intimidation, or retaliation for good faith reporting of incidents of discrimination or harassment. MSD expects all of its employees to take all necessary steps to maintain a workplace free from unlawful discrimination and harassment. MSD has an Employee Conduct Policy; the purpose of which is to ensure that all District employees treat members of the public and their co-workers appropriately and with tolerance for each person's circumstances, race, beliefs, and opinions. The policy prohibits abuse, ridicule, or any other intimidating, inappropriate, or aggressive behavior. MSD requires its employees to participate in annual training on EEO and work conduct policies.

Under MSD's Charter, the policymaking authority for MSD is its Board of Trustees. The Board of Trustees is the governing body of MSD that has the power to adopt ordinances that set the policies of MSD. Bert Berthold is MSD's Director of Operations. Berthold does not act as the policymaking authority for MSD. Final policymaking authority for MSD has not been delegated to the Director of Operations.

### i.    Facts Related to Kettler and Boatwright

In 2020, MSD employed Kettler and Boatwright as Collection System Technicians. In addition to their regular work, CSTs can work on standby crews. Standby crews provide assistance for emergency calls during night shifts and weekends for when emergency demands exceed the capacity of the standing night or weekend crews. Individuals are assigned to standby crew on a weekly basis. The assignment is essentially an overtime assignment for which maintenance staff can apply on a regular basis. Members of a standby crew are allowed to claim eight hours of time for the week to which they are assigned to standby crew even if they are not called out to work. In addition, a standby crew member is allowed to claim a minimum of four hours of time on any day they are called into work regardless of how little time they actually work that day.

A standby crew must work as a full crew. They must report to the yard out of which they operate when called in for an assignment. They must use an appropriate vehicle with appropriate tools for the assignment provided by MSD. In practice, standby crews sometimes work individually or as less than a full crew, and sometimes, they do not use an MSD vehicle with specific tools provided by MSD. Nothing about working on a standby crew changes any rules about how maintenance staff are allowed to report time. Staff are to report hours actually worked. However, employees and former employees testified they are trained that each member

9

of a crew is to report precisely the same number of hours worked as the other members and the team lead advises the crew on the number of hours to report. No team leader for a standby crew has been or ever would be authorized to change how an MSD employee is allowed to record time.

When employees perform work at MSD – including employees assigned to standby work – their work activities are supported by work orders that reflect both the nature of the work performed and the amount of time the work required. Work orders at MSD are documented in a Maximo database. All MSD work should be reflected by work orders in the Maximo work order system. However, an inexperienced team lead may fail to properly record a standing order.

In April 2020, it became apparent that certain employees on standby assignments claimed hours on timecards for work that could not be supported with other documentation or evidence. Ed Laux, the Operations Division Manager at the Grand Glaize Waste Water Treatment Plant, and Brian McGownd, the Assistant Director of Operations, conducted an investigation of the issues. The investigation covered timecards of all standby crews at the Grand Glaize Plant for the first four months of 2020. It included a review of Maximo work orders, GPS data for MSD vehicles, and review of security cameras at the yard to determine when or if standby crew workers had actually reported to the yard to perform work.

Laux discovered that Kettler and Boatwright, and all of the employees under Team Lead GP, were standby crew members who had reported time on timecards for work that was not supported by any evidence. They had 20 hours of unsupported time while on a standby crew. Their timecards reflected that they claimed four hours of unsupported time on March 4, 2020, eight hours on March 7, 2020, and eight hours on March 8, 2020. Laux interviewed Kettler and Boatwright about the discrepancies between their timecards and the work that could be supported

10

by the records. During his interview, Kettler claimed not to be able to remember anything about the time that was entered, and he asserted he had not falsified a timecard. In Boatwright's interview, Boatwright claimed that he put time down for himself when other members of his standby crew had done the work because he had been told to do so by GP. Boatright testified some of the time he was the crew member doing the work. The crew members would take turns checking a pump, and then everyone put down the same amount of time, even if only one crew member had checked the pump. Boatwright offered to pay back the money he had collected as overtime for time entries that were unsupported. He did not believe the additional pay was worth losing his job.

The results of the investigation were reported to Berthold, who is Caucasian,[1] who ultimately made the decision to terminate Kettler, Boatwright, and all of the employees directly implicated in the fraudulent timekeeping uncovered at the Grand Glaize Plant. Berthold stated he based his decision on the seriousness of their conduct along with the conduct of the other members of the standby crew at Grand Glaize. Kettler and Boatwright were both experienced MSD employees who knew, or could have been expected to know, how to enter time correctly. They should have known that they could not enter time when they did not do any work and/or were demonstrably not on the job for the time they claimed. Kettler and Boatwright testified they had been trained to report time precisely as directed by their team lead.

Team leads have no supervisory authority to discipline employees or to change or alter MSD's fundamental rules regarding time keeping and the falsification of MSD records. MSD's Overtime and Compensatory Time Policy states:

---

[1] Throughout this order, the Court refers to an individual's race using the terms provided by the parties in their filings.

Timekeeping: Employees must enter all time accurately. Fraudulent timekeeping and falsification of time records are subject to discipline, up to and including termination of employment.

MSD Civil Service Rule 11.6.b.15 provides:

The following reasons shall constitute sufficient cause for disciplinary action, although such action may be based upon reasons other than those enumerated.

15.    Falsification of District records, documents, reports, timecards or work schedules; or falsification of material fact in an investigation or an application for employment or in examination.

Both the Civil Service Rules and MSD's Collective Bargaining Agreement make it clear that there is no requirement that discipline be progressive. The Civil Service Rules make it clear that some offenses or violations are egregious enough to warrant immediate termination. In Berthold's view, the conduct of Kettler and Boatwright constituted theft, and the seriousness of their offenses warranted immediate termination.

The MSD employees who were implicated in the reporting of unsupported standby time were terminated. The team lead, GP, an African American man, either resigned or was terminated.[2] GP admitted his wrongdoing and offered an apology when it became apparent that MSD was going to terminate him. Other Collection Systems Technicians working under GP who were also terminated were SP, a Caucasian female, JH, a male of unknown race or ethnic origin, BS, a Caucasian male, and LW, an African American male. These individuals claimed time for work they never performed.

Kettler and Boatwright have identified four employees as comparators. VJ's employment with MSD ended in 2015, [3] and was never subject to the authority of Berthold, who became

---

[2] The parties dispute if GP was terminated or resigned. MSD provided a termination letter while Berthold testified at his deposition that GP resigned in anticipation of termination.
[3] The parties dispute if VJ was terminated or resigned.

Director of Operations in 2018.[4] Berthold is not aware of any timekeeping violations or false timesheets with respect to VJ.[5] In 2021, EJ received a three-day suspension for taking excessive lunch breaks and conducting personal business when scheduled to perform job duties. He was not found to have falsely claimed time for days where he performed no work at all or never reported to a jobsite. KB was a team lead for a night crew at MSD's Sulphur yard. He has never been found to have falsified a timecard or time entry.

After the discovery of fraudulent timekeeping practices for crew members at the Grand Glaize yard, Berthold ordered an investigation of timekeeping practices throughout the Operations division of MSD. Employees on the night crew were found to leave on occasions 15-30 minutes earlier than KM, the team leader. There was no evidence any of the night crew claimed time on days or shifts where they simply did not report to work or did not do any work at all, nor was there any evidence of fraudulent or false entries of time for work that had never been done. They were never found to have intentionally recorded fraudulent time. KM and his crew were given directions on the proper entry of time and the matter was resolved.

### ii.    Facts Related to Politte

Politte began her employment with MSD in June 2008 as an Operations Division Manager reporting to then Director of Operations Jonathon Sprague. In January 2015, Politte was promoted to Assistant Director of Operations. She became responsible for seven wastewater treatment plants, including the Bissell Wastewater Treatment Plant. The essential functions of her job included, among other things, providing leadership and management of the daily functions of the Operations department, directing staff to meet objectives that assist in achieving

---

[4] Plaintiffs deny this fact. However, Plaintiffs' citations to the record refer to EJ, not VJ.
[5] Plaintiffs deny this fact and cite to Politte's affidavit. Politte's affidavit does not establish that Berthold knew of any timekeeping violations by VJ. In her affidavit, Politte states it is "inconceivable" that he did not know, but does not support that Berthold actually knew of those alleged violations.

MSD's strategic business plans, participating in labor relations activities and personnel issues, and developing, training, and holding employees accountable to achieve job expectations.

In 2019, Politte began reporting to Berthold, who became Director of Operations. Politte admitted Berthold never harassed her, discriminated against her, or treated her unfairly.[6] Politte was familiar with MSD's Equal Employment Opportunity and Workplace Harassment Policy, understood that she was covered under the policy, and reported that she reviewed and received training on the policy on an annual basis. Politte understood that this policy prohibited reprisal, intimidation, or retaliation for good faith reporting of incidents of discrimination or cooperating in related investigations. Politte also understood this policy prohibited discrimination based on race or gender and that neither race nor gender should be considered when selecting someone for a job position. Politte understood that as a supervisor, MSD expected her to keep personnel information confidential.

On August 2, 2021, Politte served as an interview panelist for a job opening for an Operations Supervisor Plant Maintenance at the Bissell Plant. The four-person interview panel consisted of Politte, Bissell Plant's Division Manager Rebecca Coyle, Human Resource Representative Steve Grass, and Plant Manager John McCarthy. All these individuals are white. Politte, a senior manager, was the highest-ranking employee on the interview panel.[7] The panelists were responsible for interviewing each candidate and assigning a score from a scale of one to five for each of the candidates' responses to interview questions.

---

[6] Politte attempts to dispute this fact by stating Berthold closed the door to her office, refused to explain why she was being terminated, and attempted to get her to resign by signing a pre-typed resignation letter. This does not controvert the fact asserted by MSD.

[7] Politte denies this fact stating Grass was the leader and appointed chair of the interview panel. That does not controvert the fact that she was the highest-ranking employee on the panel.

The minimum job requirements for the Operations Supervisor position were an associate degree or 60 college credit hours and six years of treatment plant experience including two years of supervisory experience. Each of the candidates who applied for and were subsequently interviewed for the position were MSD employees and Assistant Supervisors. The candidates were JT, a black male, CK, a black male, CM, a white male, and AT, a white female. Politte asked Grass to allow her to look at the list of interview candidates, and he complied with her request.

Initially, Grass flagged KM's application because he did not meet the minimum job requirements. He had only five and a half years of the minimum six years of treatment plant experience, and only eight months of the minimum two years of supervisory experience. Grass discussed his concerns with his immediate supervisor who directed Grass to speak with the Operations Department for guidance. Politte believed KM's prior restaurant management experience from over ten years ago at a Jimmy John's was relevant. KM was included on the list of approved candidates that was finalized on July 29, 2021.

The interviews took place on August 2, 2021. Grass raised with the group of panelists his concerns about KM lacking the minimum qualifications.[8] He expressed to the group his belief that CK was the best candidate for the position because of CK's strong maintenance background, education background, and the fact that he was already handling the role on an interim basis. Each panel member scored KM the highest. In the end, the Operations Supervisor position was awarded to KM.

After learning the position was given to KM, JT and CK contacted Tracey Coleman, MSD'S Director of Human Resources, to make a complaint of discrimination in the interview

---

[8] Politte denies this fact asserting Grass had already cleared KM to be interviewed. She cites to her deposition testimony to contradict the fact, however, her testimony does not specifically contradict it.

and hiring process for the position. JT and CK believed they were passed over for the position for a less-experienced, younger, white male. Coleman took the details of the complaint and then escalated the matter to MSD's legal department. MSD attorneys Todd Aschbacher and Danielle Dailey were assigned to investigate the complaint.

On August 17, 2021, Politte sent an email to Grass requesting to review her responses to the interviews. Grass responded that Coleman retained the files because the candidates requested to discuss the interview process. Coleman responded separately to Politte and informed her that JT and CK expressed concerns over the candidate selection and that the legal department was assisting her with an investigation. As of August 19, 2021, Politte understood an investigation was underway, and the legal department was planning to contact her to conduct an interview in connection with the investigation.

On August 25, 2021, Bissell Plant Division Manager Coyle copied Politte on an email to Human Resources personnel, Belinda Farrington, in which Coyle expressed concerns about JT reporting to the Bissell Plant for the past two Mondays. On August 30, 2021, JT raised a second complaint with the MSD attorneys after JT was approached by Operations Supervisor JW and told that Politte did not want JT coming to the Bissell Plant anymore. JT was at the Bissell Plant to deliver samples as part of his job duties from the Lower Meramec Treatment Plant to the "OEC" lab at the Bissell Plant. JT's second complaint was added to the pending investigation.

Aschbacher and Dailey prepared two investigation memorandums – one for JT and CK's discrimination complaint and a second for JT's retaliation complaint. As part of their investigation, Aschbacher and Dailey met with JT and CK, reviewed relevant documents, and conducted witness interviews, including an interview with Politte. In her deposition, Politte questioned JT and CK's discrimination complaint and explained that in prior instances where

they applied for but did not get supervisory positions, they accepted the outcome without any complaints. She believed there was a broader societal change related to the murder of George Floyd that caused a cultural shift with respect to how races interacted with one another. Politte further explained that she did not perceive this shift to be endorsed by MSD.[9] She had not observed any instances of animosity between employees of different races, nor did she ever feel her colleagues treated her differently because she is white.

During the investigation, MSD received notice that JT and CKa had each filed a Charge of Discrimination with the Equal Employment Opportunity Commission. JT's charge alleged race and age discrimination and retaliation. CK's charge alleged national origin, race, and age discrimination. MSD's investigation concluded on January 26, 2022. The investigation determined there was evidence to support unfair hiring practices in the Operation Supervisor interview process as the documents showed that JT and CK had the most MSD supervisory experience, each with three and half years, while KM had only eight months of supervisory experience. The investigation determined Politte passed KM through to the interview stage even though KM did not meet the minimum qualifications of the position because he lacked the required two years of supervisory experience and had not yet rotated as an Assistant Supervisor.[10]

The investigation revealed that JT and CK's scores were lowered by an overall one and half points and three and half points respectively, and KM's scores were raised by four points.

---

[9] Politte testified she had seen Berthold not want to deal with black employees and that he was afraid to discipline black employees in fear they would file a complaint. She also testified he was afraid, even when discipline was warranted, to do anything because of his fear they would file a lawsuit. The Court has not included this as a fact because it is speculation. Politte provides no foundation for her testimony.

[10] Politte denies this fact asserting that Grass and the hiring mangers determined that KM was qualified to be interviewed. She cites to her deposition testimony to contradict the fact, but she testified as to what generally happens when individuals are interviewed for a position, not what occurred in this instance. Her testimony also contains speculation when she stated Coyle "would've looked at it."

The investigation found, and Politte confirmed, that higher level supervisor positions in the treatment facilities, including the Operations Supervisor positions were all held by white employees. The investigation concluded that JT was treated differently by Politte because JT filed a formal discrimination complaint with Human Resources. It found that Politte's conduct violated MSD's prohibition against retaliation and found that Politte breached confidentiality regarding a confidential personnel investigation.[11]

Politte acknowledged that she contacted JT's then direct supervisor, Operations Division Manager Chris Pfeuffer, to ask about JT's presence at the Bissell Plant. She told Pfeuffer during that conversation that JT had filed a discrimination complaint. Pfeuffer, in his interview with Aschbacher and Dailey, reported that Politte told him about JT's complaint and directed Pfeuffer to "keep an eye" on JT.[12] Politte could not remember if she had said that, but she does not believe Pfeuffer was dishonest in his interview.

On January 26, 2022, MSD attorneys provided their investigation memorandums to Berthold and Coleman. Based on the findings from the investigation about Politte's misconduct, and because Politte was a senior management employee found to have engaged in severe misconduct in violation of MSD's policies, Berthold determined that termination of Politte's employment was warranted. Berthold was the sole decision maker in Politte's discharge. He delivered the termination decision to Politte on March 17, 2022. Berthold handed Politte her termination letter, did not explain why she was being terminated, and attempted to get Politte to resign by signing a pre-typed resignation letter, but she refused to do so.

---

[11] Politte denies this fact and asserts she did not retaliate against JT. This statement does not controvert the fact that the investigation found she retaliated.

[12] Politte objects to this fact as inadmissible hearsay. Politte's statements to Pfeuffer are admissible pursuant to Federal Rule of Evidence 801(d)(2) as an opposing party's statements. Pfeuffer's statements to the investigators are not hearsay because they are not introduced for the truth of the matter asserted but instead to show how the investigation came to its conclusions.

18

After her termination, Politte dually filed a charge of discrimination against MSD with the Equal Employment Opportunity Commission and the Missouri Commission on Human Rights on May 13, 2022. Politte claims she was discharged because she is a woman and claims that the Assistant Director of Environmental Compliance JH, a white male, was treated more favorably because he was not terminated from employment after he was the subject of an internal complaint and subsequent EEOC charge alleging he engaged in discrimination against female employees. Politte asserts that Principal Engineer NE, a white female, filed an internal complaint and then an EEOC complaint against JH alleging he discriminated against her because she is a woman. Politte believed that her role in promoting KM over JT and CK was similar to Hoskin's alleged promotion of a less qualified male over NE.

MSD has a record of NE filing an internal audit concerning JH in which she alleged that he engaged in conduct which she believed constituted gender bias, favoritism, and retaliation. The human resources department and legal department jointly investigated NE's complaint and determined that her allegation could not be substantiated. NE explained that while she spoke to the EEOC about pursuing a charge of discrimination against MSD in connection with Hoskin's alleged conduct, she ultimately decided not to file a charge. NE testified she did not pursue a lawsuit because she was transferred to a new position within the company. MSD has no record of a charge of discrimination filed against it concerning claims against JH. JH does not work in the Operations Department. He works in MSD's Engineering Department and reports to Director of Engineering Rich Unverferth. He has never reported to Berthold, who has no knowledge of the internal audit complaint filed by NE.

19

## C.    Discussion

In its motions for summary judgment, MSD asserts six arguments: (1) Plaintiffs' § 1981 claims must be brought under § 1983 because MSD is not a covered employer under § 1981; (2) there is no evidence of an unconstitutional policy or custom of MSD; (3) Plaintiffs have not established a prima facie case of race or gender discrimination under § 1981, Title VII, or the MHRA; (4) Plaintiffs cannot prove MSD's legitimate, nondiscriminatory reasons for termination were pretext; (5) punitive damages under Title VII, § 1981, and § 1983 are barred as a matter of law; and (6) there is no evidence to support a finding of punitive damages under the MHRA.

### i.    Claims brought under § 1981

MSD argues that Plaintiffs' claims brought under § 1981 must be brought under § 1983, because MSD, as a governmental entity, is not a covered employer under § 1981. In response, Plaintiffs assert that MSD should be characterized as a hybrid municipal corporation because it performs proprietary functions. Plaintiffs also ask the Court to allow them to amend their complaint to assert § 1983 claims given MSD's delay in raising this issue until summary judgment.

When a claim is raised against a state actor for a violation of rights guaranteed by § 1981, § 1983 provides the exclusive federal damages remedy for the violation. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989). Thus, an action to enforce rights under § 1981 must be brought under § 1983. *Artis v. Francis Howell N. Band Booster Ass'n, Inc.*, 161 F.3d 1178, 1181 (8th Cir. 1998). Claims against state actors brought under § 1981 are subject to dismissal. *Rodgers v. Univ. of Mo. Bd. of Curators*, 56 F. Supp. 3d 1037, 1050 (E.D. Mo. 2014) (dismissing § 1981 claims that should have been brought under § 1983); *Gray v. Ark Dep't of Human Servs.*, 2010 WL 1052925 at *1 (E.D. Ark. Mar. 22, 2010) (same).

MSD is a municipal corporation organized under the Missouri Constitution. Mo. Const. Art. 6 § 30(a). Thus, any claims against MSD for a violation of rights guaranteed by § 1981 must be brought pursuant to § 1983. Plaintiffs argue MSD is a hybrid municipal corporation performing proprietary functions so it should be treated as a private actor, not a state actor. However, the cases they cite do not support this proposition. In *Stacy v. Truman Medical Center*, 836 S.W.2d 911 (Mo. 1992), *Southers v. City of Farmington*, 263 S.W.3d 603, 314 (Mo. 2008), *State ex rel. Trimble v. Ryan*, 745 S.W.2d 672 (Mo. 1988), and *State ex rel. Regional Justice Information Service Commission v. Saitz*, 798 S.W.2d 705 (Mo. 1990), the Missouri Supreme Court decided issues related to the application of sovereign and official immunity for government entities under state law. None of these cases were deciding whether an entity qualifies as a state actor for the purposes of § 1981 or § 1983.

Plaintiffs also assert MSD "sandbagged" them by not raising the issue earlier in the litigation. Again, Plaintiffs provide no support for their assertion that MSD must inform them of deficiencies in their own complaint before the summary judgment stage of litigation. With that said, the Court will liberally construe Plaintiffs' complaint as including claims for violations of § 1981 brought under § 1983 pursuant to *Lockridge v. Board of Trustees of University of Arkansas*, 315 F.3d 1005, 1007 (8th Cir. 2003) wherein the Eighth Circuit faced a similar issue and construed the plaintiff's § 1981 claims as brought under § 1983.

### ii.    Municipal Liability under § 1983

A municipality can only be liable for a constitutional violation under § 1983 if the violation resulted from an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise.[13] *Corwin v. City of Independence, Mo.*, 829 F.3d 695,

---

[13] Plaintiffs do not allege a failure to train or supervise so the Court will not discuss that avenue of liability.

699 (8th Cir. 2016) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)). "Policy and custom are not the same thing." *Id*. at 699-700. A policy is "a deliberate choice of a guiding principle or procedure made by the municipal official who had final authority regarding such matters." *Id*. at 700 (quoting *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999)). "[W]hether an official ha[s] final policymaking authority is a question of state law.["] *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 483 (1986)).

In contrast, to establish liability through an unofficial custom, a plaintiff must show "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was the moving force behind the constitutional violation." *Corwin*, 829 F.3d at 700 (quoting *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014)). The custom must be so "widespread as to have the force of law." *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 404 (1997).

In her response, Politte argues Berthold was the final decision maker for each Plaintiffs' discharge from employment and thus, his actions constituted municipal policy. In Kettler and Boatwright's response, they conceded that policy-making authority for MSD is solely vested in its Board of Trustees.[14] They instead claim the Board of Trustees has unofficially delegated decision-making authority about matters of discharge and discipline to its appointing authorities, such as Berthold. Thus, according to Kettler and Boatwright, Berthold exercised "unofficial

---

[14] The Court notes that despite the differing responses on the same issue (who has policy-making authority at MSD), Politte, Kettler, and Boatwright are all represented by the same counsel.

policy-making authority regarding discipline and discharge within Operations." ECF Nos. 96, 103.

"An action may constitute official municipal policy only if the decisionmaker in question possesses final authority to establish municipal policy with respect to the action ordered." *Bolderson v. City of Wentzville, Mo.*, 840 F.3d 982, 985 (8th Cir. 2016) (citing *Hess v. Ables*, 714 F.3d 1048, 1054 (8th Cir. 2013)). "A single decision by a municipal authority can in some circumstances constitute official policy." *Id.* (citing *Pembaur*, 475 U.S. at 480-81). However, "[t]he fact that 'a particular official – even a policymaking official – has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.'" *Id.* at 985-86 (quoting *Davison*, 490 F.3d at 660). "[P]ossessing 'discretion to hire and fire does not necessarily include responsibility for establishing related policy.'" *Id.*

The undisputed facts in this matter establish that under MSD's Charter, the Board of Trustees is the policymaking authority for MSD. There is no evidence that the Board has delegated its policymaking authority to Berthold. As stated in *Bolderson*, Berthold's discretion to hire and fire employees does not necessarily mean he has authority to establish policy related to the hiring and firing of employees, and Plaintiffs have not presented evidence otherwise. "Simply going along with the discretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy." *Id.* at 986 (citing *Williams v. Butler*, 863 F.2d 1398, 1402 (8th Cir. 1988) (en banc)). Plaintiffs have not established that an official policy or a decision by a policy-making authority is the moving force of the alleged violations of § 1981.

Plaintiffs also assert MSD has an unofficial custom of "meting out no or lesser discipline to black employees than to non-black employees." ECF Nos. 96, 103. Kettler and Boatwright assert this custom is shown by the disparate treatment of the two of them, who were discharged, and Kevin Mullen and his crew, who received no discipline at all, and EJ, who only received a three-day suspension. Politte argues Plaintiffs have presented evidence of this custom but does not explain what that evidence is.

The two examples provided by Kettler and Boatwright – the treatment of Kevin Mullen and his crew, and EJ – are not sufficient to establish a "continuing, widespread, persistent pattern of unconstitutional misconduct" by MSD. *Corwin*, 829 F.3d at 700. Two incidents cannot be considered a pattern of widespread and pervasive unconstitutional conduct. *Brewington v. Keener*, 902 F.3d 796, 802 (8th Cir. 2018); *see also Burbridge v. City of St. Louis, Mo.*, 430 F. Supp. 3d 595, 620-21 (E.D. Mo. 2019) ("[T]wo or three incidents, occurring nearly a year apart and two years before any of the events at issue in this case, do not constitute a continuing, widespread, persistent pattern."); *Naes v. City of St. Louis*, 2020 WL 6044356 at *6 (E.D. Mo. Oct. 13, 2020) (finding five instances of misconduct over five years did not establish a widespread, persistent pattern of unconstitutional misconduct). Plaintiffs have not established a custom that is continuing, widespread, and persistent. Therefore, they have failed to establish MSD's liability under § 1983.

Kettler and Boatwright also propose three other practices at MSD that they argue are relevant: (1) the formal training of maintenance employees that the team lead will calculate the crew's time and each crew member must match their time to the team lead; (2) that employees may respond to overtime calls directly from their home using their personal vehicle rather than from the MSD yard using an MSD vehicle; and (3) that only one or two members of a three-

person crew may respond to a call and all of the crew will then share the time. Kettler and Boatwright do not explain why these alleged customs constitute unconstitutional misconduct or how they were injured by these customs, as is required to establish municipal liability through an unofficial custom. *Corwin*, 829 F.3d at 700.

Plaintiffs have not established the § 1981 violations they assert in their complaint resulted from an official policy or an unofficial custom. Therefore, they have not established municipal liability under § 1983. The Court must dismiss their claims under § 1981 that the Court has construed under § 1983.

### iii.    Prima Facie Case

MSD argues Plaintiffs have not established prima facie cases of discrimination. In their complaint, Plaintiffs assert claims under § 1981, Title VII, and the MHRA for race and gender discrimination. Kettler and Boatwright alleged only a violation of § 1981 for race discrimination. Because their § 1981 claim, as well as Politte's § 1981 claim, fails for the reasons identified above, the only remaining claims for the Court to decide are Politte's claims alleging race and gender discrimination under Title VII and the MHRA.

The purpose of Title VII is to ensure a workplace environment free of discrimination. *Ricci v. DeStefano*, 557 U.S. 557, 580 (2009). The Act prohibits "employer discrimination on the basis of race, color, religion, sex, or national origin, in hiring, firing, salary structure, promotion and the like." *Winfrey v. City of Forrest City, Ark.*, 882 F.3d 757, 758 (8th Cir. 2018). When a plaintiff does not present direct evidence of discrimination, like in this case, the Court "analyze[s] her claim under the *McDonnell Douglas* burden-shifting framework." *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 878 (8th Cir. 2014) (quoting *Wells v. SCI Mgmt, L.P.*, 469 F.3d 697, 700 (8th Cir. 2006)); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1993).

Under this framework, Politte must first establish a prima facie case of discrimination. "A prima facie case of discrimination requires that the plaintiff '(1) is a member of a protected class; (2) was meeting the legitimate expectations of the employer; (3) suffered an adverse employment action; and (4) suffered under circumstances permitting an inference of discrimination.'" *Schaffhauser v. United Parcel Serv. Inc.*, 794 F.3d 899, 903 (8th Cir. 2015) (quoting *Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 681 (8th Cir. 2012)). If Politte establishes a prima facie case, the burden then shifts to MSD "to articulate a legitimate, nondiscriminatory reason for its action." *Id*. If MSD meets this burden, then Politte "must show that the proffered nondiscriminatory reason is merely a pretext for unlawful discrimination." *Id*. The elements of a prima facie case for a Title VII and MHRA claim are the same and the Court's analysis is the same for both. *Saulsberry v. St. Mary's Univ. of Minn.*, 318 F.3d 862, 866 (8th Cir. 2003); *Finley v. Empiregas, Inc. of Potosi*, 975 F.2d 467, 473 (8th Cir. 1992).

MSD argues Politte cannot establish a prima facie case of race or gender discrimination nor can she establish MSD's nondiscriminatory reason for her termination is merely pretext for unlawful discrimination. The Court does not need to address whether Politte establishes a prima face case because, even assuming Politte has done so, she is unable to show MSD's reason for her termination was merely pretext.

Under the *McDonnell-Douglas* burden-shifting framework, MSD has the burden to "articulate a non-discriminatory, legitimate justification for its conduct which rebuts [Politte's] prima facie case." *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 954 (8th Cir. 2012). "This burden is not onerous." *Id*. MSD's justification for Politte's termination is that its investigation found she had violated MSD's policies against discrimination, retaliation, and disclosure of confidential information. Violations of company policy are legitimate reasons for termination.

26

*Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003); *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999). The burden now shifts back to Politte to show pretext.

"An employee may show pretext through various means, such as by presenting evidence that the employer treated similarly-situated employees in a favorable manner, did not follow its own policies, 'shifted its explanation of the employment decision,' or by showing evidence of a decision maker's biased comments." *Lightner v. Catalent CTS (Kansas City), LLC*, 89 F.4th 648, 653 (8th Cir. 2023) (quoting *Grant v. City of Blytheville*, 841 F.3d 767, 774 (8th Cir. 2016)). Commonly, plaintiffs show pretext by showing that the employer's stated reason is false, or through the disparate treatment of similarly situated employees. *Williams v. United Parcel Serv., Inc.*, 963 F.3d 803, 808-09 (8th Cir. 2020). When proving a reason is pretext by showing that the employer's reason is false, the plaintiff must also show that discrimination was the real reason for the adverse action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). Politte asserts MSD's reason for terminating her is false arguing MSD blamed Politte and ignored the policy, custom, and practice of how panel interviews are conducted at MSD.

Politte provides no evidence of her assertions that MSD's reason for her termination is pretext beyond her own self-serving, conclusory affidavit. *Armour & Co., Inc. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993) ("Conclusory affidavits do not provide a basis upon which to deny motions for summary judgment."); *Flannery v. Trans World Airlines, Inc.*, 160 F.3d 425, 428 (8th Cir. 1998) (Conclusory affidavits are insufficient to withstand a properly supported motion for summary judgment). Her affidavit that she relies on includes statements such as: "MSD was afraid of their complaints and did not enforce its own policy, custom, and practice"; "This is nonsense"; "That is just stupid"; "That's not Plaintiff's personality"; and

many similar conclusory statements without any specific supporting facts. Politte does not point the Court to any specific evidence in the record that supports her conclusory statements.

Even if the Court were to accept her affidavit in its entirety, at most she creates a dispute of fact about how interview panels are conducted at MSD. The Court is only concerned about *material* facts in dispute, and whether an interview panel was conducted according to MSD's customs is not material to this summary judgment. Politte does not create a dispute about her violation of MSD's policies against discrimination, retaliation, and disclosure of confidential information. Politte herself admitted in her deposition that she disclosed JT's discrimination complaint to his supervisor, which MSD's investigation found was a breach of confidentiality concerning a confidential personnel investigation and a violation of MSD's policies. Consequently, Politte has not shown that MSD's reason for her termination has *no* basis in fact. *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 881 (8th Cir. 2005).

Politte also has not shown pretext by presenting evidence that MSD treated similarly situated employees in a disparate manner. *Williams*, 963 F.3d at 808. The test for whether someone is similarly situated, at the pretext stage, is rigorous. *Id*. at 808-09. The comparator must be similarly situated in all relevant aspects. *Id*. This means the comparators "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Collins v. Kansas City Mo. Public Sch. Dist.*, 92 F.4th 770, 772 (8th Cir. 2024) (quoting *Beasley v. Warren Unilube, Inc.*, 933 F.3d 932, 938 (8th Cir. 2019)).

Politte argues she does not need to demonstrate a comparator was treated more favorably because "this is an adverse employment action, reverse race discrimination claim." She cites to *Bonenburger v. St. Louis Metropolitan Police Department*, 810 F.3d 1103 (8th Cir. 2016).

*Bonenburger* was a race discrimination case concerning a police officer who was denied an interview for a position at the police academy. *Id*. at 1105-06. *Bonenburger* dealt with whether a sought-after transfer constitutes an adverse employment action and whether sufficient evidence was offered at trial to prove a conspiracy claim. *Id*. at 1107-09. At no point did the Eighth Circuit discuss how a plaintiff can prove pretext, or when a plaintiff needs to show similarly situated employees were treated in a disparate manner. *Bonenburger* does not support Politte's argument.

Politte does not provide any comparators for her race discrimination claims. The comparators proposed by Kettler and Boatwright – the black employees who were allegedly disciplined more leniently for the same behavior – do not compare to Politte. They are not subject to the same standards as Politte in her position as an Assistant Director, and they did not engage in the same conduct. Politte was accused by MSD of having discriminated and retaliated against another employee, and disclosed confidential information whereas the proposed comparators were investigated for timekeeping violations.

Politte's comparator for her gender discrimination claim is also not similarly situated to her. Politte asserts that JH, a white male, was treated more favorably than her because he was not terminated after a female employee accused him of gender bias, favoritism, and retaliation. JH is not similarly situated to Politte because he does not work in the same department as her and he reports to a different supervisor than she did. Additionally, MSD's investigation of the complaint against JH found it could not be substantiated, whereas the investigation of Politte did find evidence of violations of MSD's policies.

Politte has not shown MSD's legitimate nondiscriminatory reason for her termination was pretext. Therefore, the Court must dismiss her claims of race and gender discrimination

29

under Title VII and the MHRA. Because the Court will dismiss all of Plaintiffs' claims, it need not address MSD's arguments concerning punitive damages.

Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED and DECREED** that Defendant's Motion for Summary Judgment Directed to Catherine Politte (ECF No. 81) is **GRANTED**.

**IT IS FURTHER ORDERED** that Motion for Summary Judgment Directed to Plaintiffs Gerald Kettler and Dennis Boatwright (ECF No. 83) is **GRANTED**.

**IT IS FURTHER ORDERED** that Motion to Strike Portions of the Declaration of Catherine Politte in Opposition to Defendant's Motion for Summary Judgment (ECF Nos. 118, 120) is **GRANTED, in part, and DENIED, in part.**

**IT IS FURTHER ORDERED** that Plaintiffs' claims are **DISMISSED**, with prejudice.

So Ordered this 30th day of July, 2024.

**STEPHEN R. WELBY**
**UNITED STATES MAGISTRATE JUDGE**